LANCASTER & WIGHT v. ALLEN.
(No. 2022.)

(Court of Civil Appeals of Texas. Texarkana. Dec. 23, 1918. Rehearing Denied Jan. 2, 1919.)

1. MASTER AND SERVANT ⚹286(14)—DERAILMENT OF ENGINE—JURY QUESTION—DEFECTIVE SWITCH POINT.

In action for death of locomotive fireman from derailment of engine engaged in interstate commerce, evidence that switch point was in a condition to cause wheel to climb on top of rail and cause derailment was sufficient to warrant the submission to jury of whether switch point was defective.

2. APPEAL AND ERROR ⚹1002 — FINDING—CONFLICTING EVIDENCE.

Jury's finding settled conflict in the evidence.

3. COMMERCE ⚹8(6)—INTERSTATE COMMERCE—LAWS APPLICABLE.

In action for death of fireman engaged in interstate commerce, Act Cong. Feb. 17, 1911 (U. S. Comp. St. §§ 8630–8639), to promote the safety of employés and travelers by compelling common carriers to equip their locomotives with safe and suitable boilers, and section 2 of that act, as amended by Act Cong. March 4, 1915 (U. S. Comp. St. §§ 8639a–8639d), and the regulations of the Interstate Commerce Commission, constitute the law of the case.

4. MASTER AND SERVANT ⚹110 — NEGLIGENCE OF RAILROAD—ACT OF CONGRESS.

Act Cong. Feb. 17, 1911 (U. S. Comp. St. §§ 8630–8639), providing for official inspection of locomotives engaged in interstate commerce under rules of Interstate Commerce Commission, did not change railroad's legal duty to exercise ordinary care to keep its machinery in reasonably safe condition, so that the fact that an appliance is not condemned upon inspection is not conclusive on question of whether it is a safe appliance.

5. DEATH ⚹86(2)—DAMAGES—ACTUAL EARNING POWER.

In action for death, where deceased leaves widow and children, damages are not limited to loss of actual earning power of deceased, and jury may award children damages for loss of a father's nurture and admonition.

6. DEATH ⚹99(4)—EXCESSIVE DAMAGES.

In action for death of 48 year old fireman, a $27,000 judgment, awarded to widow and seven children, was not so excessive as to require reduction by Court of Civil Appeals.

Appeal from District Court, Harrison County; P. O. Beard, Judge.

Action by Mrs. Clara Allen, administratrix, against Lancaster & Wight, receivers. Judgment for plaintiff, and defendant appeals. Affirmed.

F. H. Prendergast and Brown & Hall, all of Marshall, for appellant.
S. P. Jones and J. T. Casey, both of Marshall, for appellee.

HODGES, J. This appeal is from a judgment for $27,000, rendered in favor of the widow and children of T. O. Allen, deceased, against the receivers of the Texas & Pacific Railway Company. Allen was killed as a result of the derailment of the engine on which he was employed as a fireman. The accident occurred near a switch in the railway yards at Texarkana, Tex., as the engine pulling the train was approaching the depot.

[1] The court submitted only two of the grounds of negligence set out in the plaintiff's original petition, a defective switch point, and a defective flange on a wheel of the front trucks of the engine. The appellant contends that the evidence as to a defective switch point was not sufficient to authorize the submission of that issue to the jury. While the testimony does not make clear just what caused the derailment of the engine, evidence was admitted, apparently without objection, which tended to show that the switch point was in a condition to cause the wheel to climb on top of the rail and produce such an accident. We are not prepared to say that this evidence was not sufficient to warrant the submission of that issue to the jury.

[2] There was considerable testimony offered by both sides as to the condition of the flange on a front wheel of the engine trucks. That of the appellee tended to show that the flange was worn to such an extent that it was unsafe to keep the wheel in the service. It appeared from the evidence generally that

wheels are constructed so that the angle made by the flange and the tread of the wheel is oblique; that in the course of time the wear resulting from friction tends to make that angle more acute; that the flange becomes thinner, and its inside surface next to the rail becomes more nearly vertical. The appellant introduced in evidence the rules and tests promulgated by the Master Car Builders' Association, which were approved by the Interstate Commerce Commission. Several of appellants' witnesses testified that a gauge had been adopted by which to measure the extent of the wear of the flange and thus determine when the wheel became deteriorated to such an extent that it should be put out of service. They testified that they had applied the gauge to this particular wheel, and that according to the rules it was not subject to condemnation. The state of the evidence was such that the jury might have found either way regarding the condition of the wheel; and their verdict settled the conflict.

Appellants requested, among other special charges, the following:

"It appears in this case that Allen at the time he was killed was engaged in interstate commerce, and the rights of the plaintiff are therefore governed by the act of Congress. If you believe in this case that the flanges on the wheel were in accordance with said rules enacted by the Interstate Commerce Commission, then you cannot find that the railroad company was negligent in that regard."

[3] The refusal to give that charge is assigned as error. It is conceded that Allen was at the time of the injury assisting in operating a train engaged in interstate commerce, and it follows that the act of Congress and the regulations of the Interstate Commerce Commission, so far as applicable, should constitute the law of this case. In 1911 Congress enacted a law entitled "An act to promote the safety of employés and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their locomotives with safe and suitable boilers and appurtenances thereto." Act Cong. Feb. 17, 1911, c. 103, 36 Stat. 913 (U. S. Comp. St. §§ 8630–8639). The second section (section 8631) is as follows:

"That from and after the first day of July, nineteen hundred and eleven, it shall be unlawful for any common carrier, its officers or agents, subject to this act to use any locomotive engine propelled by steam power in moving interstate or foreign traffic unless the boiler of said locomotive and appurtenances thereof are in proper condition and safe to operate in the service to which the same is put, that the same may be employed in the active service of such carrier in moving traffic without unnecessary peril to life or limb, and all boilers shall be inspected from time to time in accordance with the provisions of this act, and be able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for."

In 1915 this law was amended (Act Cong. March 4, 1915, c. 169, 38 Stat. 1192 [U. S. Comp. St. §§ 8639a–8639d]) so as to make it apply to and include the entire "locomotive and tender and all of parts and appurtenances thereof." The act provided for a system of official inspection to be conducted under rules and tests approved by the Interstate Commerce Commission. Carriers engaged in interstate commerce were required to file with the chief government inspector their rules and instructions for the inspection of their boilers, locomotives, tenders, and appurtenances. And after a hearing and approval by the Interstate Commerce Commission such rules and instructions, with such modifications as the commission required, should become obligatory upon the carriers. It was also provided that if any carrier failed to file its rules and instructions, rules and instructions not inconsistent with the law were to be prepared by the chief inspector, and, after approval by the Interstate Commerce Commission, should become obligatory. A penalty of $100 was prescribed for a violation of any of the terms of the act, to be recovered in a suit filed in the District Court of the United States by or under the direction of the Attorney General. It was further provided that whenever a boiler, locomotive, or tender, or any of their appurtenances, were found to be in a condition not in conformity with the laws, rules, and tests adopted and approved as provided, the use of such machinery should be discontinued. The evidence shows that in obedience to that law rules and tests had been adopted for determining when car wheels had become so worn as to be condemned as unsafe. Testimony offered by the appellants tended to show that the wheel alleged to be defective was not unsafe according to the tests prescribed by the rules adopted for that purpose.

[4] The propriety of giving the requested charge depends upon whether the tests approved by the Interstate Commerce Commission furnished the sole standard for determining the fitness of the wheel for use by the appellant. In his general charge the court had instructed the jury that the term "negligence" meant a failure to exercise ordinary care, and ordinary care was such care as a person of ordinary prudence would exercise under the same circumstances. He further told the jury that the receivers operating the railroad were required to exercise ordinary care to furnish its servants reasonably safe and suitable machinery for the work they were employed to perform, and to exercise ordinary care to keep that machinery in a reasonably safe condition for the transaction of its business;

that if the defendants exercised that care, then the plaintiff was not entitled to recover. No complaint is made of the common-law tests thus laid down for the guidance of the jury in determining whether or not the railway company had been guilty of negligence in continuing the use of the wheel in question. In the absence of any statute prescribing a different test, that adopted by the court is the one generally approved. When Congress enacted the law which authorized the Interstate Commerce Commission to provide rules and tests, it is not to be assumed that it was intended to lower the standard of caution which has so long prevailed and which is so universally recognized by the courts of this country. The more reasonable inference is that the law was designed to enhance the safety of railway transportation by requiring greater precautions against the retention of defective machinery. The effect of the statute and the appropriate regulations which it authorized was to make the failure to comply with its standards negligence as a matter of law; whereas before this adoption such failure presented an issue of fact to be determined by the jury according to the common-law standard. That, however, did not otherwise alter the legal duty of the railway company to still exercise ordinary care to keep its machinery in a reasonably safe condition. 1 Thompson on Negligence, § 13; Sutton's Administrators v. Wood et al., 120 Ky. 23, 85 S. W. 201, 8 Ann. Cas. 894. The tests prescribed and approved by the commission were not expected to be the sole legal guides for determining whether or not ordinary care has been exercised by railroad companies in respect to their machinery; by a special provision of the law carriers had the right to adopt rules requiring higher standards of fitness than those permitted by rules and tests. The rules of the commission were merely to determine when machinery had become so deteriorated that it must be removed from the service, and are not to be looked upon as licensing the retention of all machinery which might not be subject to condemnation, regardless of its effect upon the public safety. While it is not likely that loyal and competent government inspectors would adopt rules which permit the retention of machinery that common prudence would condemn as unsafe, yet their failure to condemn cannot operate as conclusive proof of a safe appliance. We are therefore of the opinion that the court did not err in refusing the special charge quoted. If the tests approved by the commission were more exacting than those recognized by common-law rules, the appellants have no right to complain at the refusal of the court to give the special charge. On the other hand, if those tests permitted the retention of machinery which men of ordinary prudence would condemn as unsafe, appellants were not entitled to the charge. For it is not to be assumed that Congress intended to authorize a lessening of the precautions for the safety of the public and the employés on railway trains.

The appellee offered in evidence a plaster cast of the wheel which it is claimed was defective. This plaster cast was made by one of the attorneys who represented the appellee in the trial in the court below. Over the objection of the appellant this attorney was permitted to detail the circumstances under which he took the plaster cast, and to testify that it was correctly taken. The objection urged was that the witness, being an attorney in the case, should not have been permitted to become a witness for proving such facts. It is argued that such conduct was a violation of the rules of professional ethics and should be rebuked by reversal of the judgment. Whatever may be said as to the professional propriety of an attorney engaging in that method of preserving and presenting evidence, we are not disposed to go to the extent insisted upon by counsel for the appellant. We do not feel justified in visiting upon an unoffending client the consequences of an improper act on the part of an attorney where such act has not illegally prejudiced the rights of the opposing party in the trial of the case. An attorney in a case is not by reason of his employment, rendered incompetent as a witness, except in certain instances. If his testimony is rejected it is upon the sole ground that he violated the rules of professional ethics.

[5, 6] The deceased left a widow and seven children. To the widow the jury apportioned $8,000, and the remainder was divided among the children, whose shares ranged from $250 to $4,500. It may be that the deceased, who was 48 years old at the time of his death and had an expectancy of something over 22 years, could not have earned, clear of his personal expenses, that amount of money, had he lived out his expectancy. But we do not understand the rule to be that the amount of damages recoverable in actions of this kind is limited to the loss of the actual earning power of the deceased. The children lose more than what their father would give them in dollars and cents; by the wrongful act of the railway company they were deprived of a father's nurture and admonition, and it is left to the jury to place a pecuniary value upon that feature of their loss. While the verdict in this case seems to be a liberal one, we do not feel justified in holding that it is so excessive as to require reduction.

The judgment is affirmed.