McKEE v. JAMESTOWN BAKING CO., Inc.
(Burns et al., third party defendant).

No. 10680.

United States Court of Appeals
Third Circuit.

Argued June 2, 1952.

Decided July 22, 1952.

Harold E. McCamey, Pittsburgh, Pa. (Arthur G. Stein, Dickie, McCamey, Chilcote, Reif & Robinson, Pittsburgh, Pa., on the brief), for appellant.

Zeno Fritz, Pittsburgh, Pa. (Louis C. Glasso, Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and KALODNER and STALEY, Circuit Judges.

BIGGS, Chief Judge.

The instant suit arises out of a collision of a bread delivery truck, belonging to and operated by the original defendant, Jamestown Baking Co., Inc., with a steel cable stretched by the third-party defendant, C. F. Burns, across Curry Avenue in the Borough of St. Marys, Elk County, Pennsylvania. The cable extended from a steel beam which the plaintiff's deceased husband, George McKee, Burns' foreman, was endeavoring to have dragged across the street for use in a new building. The suit alleges that Jamestown was negligent and jurisdiction [1] is based on diversity and jurisdictional amount. The law of Pennsylvania is, of course, applicable. The plaintiff recovered a verdict and judgment in the sum of $69,769.55 against Jamestown and Burns.[2] Jamestown has appealed.

At the close of plaintiff's case Jamestown moved orally for a non-suit, a directed verdict and a new trial. After verdict and judgment Jamestown filed a motion pursuant to Rule 50(b), F.R.C.P., 28 U.S.C., to have the verdict and judgment set aside and judgment entered in its favor, and in the alternative to have a new trial granted. Jamestown contended that proof of its negligence was insufficient and that contributory negligence on the part of McKee had been shown as a matter of law. Jamestown asserted also that the court below was

1. The parties stipulated that the plaintiff is a citizen of Pennsylvania and the defendant is a New York corporation.

2. The verdict and judgment in favor of the plaintiff was entered jointly against Jamestown Baking Co. and C. F. Burns, the latter, as we have indicated, having been brought upon the record as a third-party defendant by Jamestown Baking Co. C. F. Burns has not appealed.

in error in refusing to admit in evidence a police report of the accident, in refusing to charge as requested, in failing to explain the concept of "present worth" of a sum sufficient to compensate the plaintiff and those whom she represents, in directing the jury to bring in a verdict in a single lump sum of money, and in permitting an excessive verdict to stand. The court below rejected these contentions and by its order denied the defendant's motion. See 101 F. Supp. 794.[3]

The pertinent facts are as follows. Jamestown's delivery truck rounded a curve on Depot Street and was proceeding east in the Borough of St. Marys. The curve is approximately 200 feet from the point at which the accident occurred. About 100 feet from the curve Depot Street ends and Curry Avenue commences. Curry Avenue, a dead-end street, sixteen feet wide and with black top paving, leads east in the same direction and is an extension of Depot Street. The collision took place on Curry Avenue, 100 feet from its junction with Depot Street, about 1:30 P.M. on a hot clear day.

In the vicinity of the accident on Curry Avenue are located several houses, a grocery store (to which Jamestown's truck was about to make delivery), a beer garden, and the rear of the plant of the Stackpole Carbon Co. At the point where Depot Street in effect becomes Curry Avenue, Tannery Street intersects from the south. Tannery Street does not project north, with the result that the intersection 100 feet from the accident is a "T". The normal course of traffic is on Depot and Tannery Streets and not on dead-end Curry Avenue. At the time of the accident there were no vehicles in motion other than the delivery truck on any of the three streets insofar as is here pertinent.

About 100 feet from the "T" intersection of Depot and Tannery Streets and Curry Avenue the delivery truck hit the steel cable. The cable was hitched to the steel beam with the intention of winching it by a winch on a truck from the north side of Curry Avenue, where it had been delivered by railroad, to the south side of Curry Avenue, where Burns, with McKee, the deceased, as foreman in charge, was erecting an addition to the Stackpole Carbon Co. The beam was ten inches by twenty feet and weighed 720 pounds; it had been loosened from a pile of similar beams lying 30 feet north of Curry Avenue; and it lay 10 or 15 feet north of Curry Avenue when McKee with helpers attached the steel cable. At the moment of the collision, the beam, according to a witness, Robert Burns, a brother of the third-party defendant, had not been moved. Burns testified that the accident happened "just as the thing [the steel cable] tightened up". According to Hoffer, another eye-witness, the beam had been moved three to four feet by the winch and cable when the accident occurred. These witnesses had equal opportunity to observe what happened for they both were workmen engaged in the building project and were standing to the rear and to one side of the beam. The collision caused both the beam and McKee to be thrown 30 feet and 45 feet, respectively.

Wheeler, the driver of the bread truck, may or may not have been able to see McKee, Robert Burns and Hoffer near the steel beam on the north side of Curry Avenue. Guthrie, operator of Burns' winch, testified that cars, customarily parked on the side where the beam lay and between the beam and the direction from which the bread truck proceeded, had all been moved to make room for the pile of beams. This was contradicted by Police

3. So far as appears from the record Jamestown did not, at the close of all the evidence, renew its demand for a directed verdict. Such a failure has been held sufficient to preclude review of the sufficiency of evidence in actions at law by an appellate court. Minnehaha County, S. D. v. Kelley, 8 Cir., 150 F.2d 356; Hart v. Grim, 8 Cir., 179 F.2d 334;

Harnik v. Lilley, 8 Cir., 167 F.2d 159; Novick v. Gouldsberry, 9 Cir., 173 F.2d 496. Our conclusion, however, does not rest on this inadvertent omission on the part of counsel, *for* in our view there was substantial evidence in support of the verdict, and no reversible error as to Jamestown was committed by the court below.

Chief Goetz who stated that he had observed cars parked at this point throughout his patrols during the week preceding the accident, as well as by photographs taken within two hours of the accident in which parked cars appeared. Wheeler testified that he saw no one but did not recall whether cars were parked so as to obstruct his view.

It is clear that there was no outward sign of building activity on the other side, viz., on the south border of Curry Avenue. A pile of bricks lay a little off the street to the south but a white house obstructed Wheeler's view of the new construction. The truck containing the winch was parked 30 feet south, off the road and actually within the new building. Wheeler, however, stated that he knew from the previous occasions on which he had made deliveries to the grocery store that the building construction was in progress. He testified, however, that he saw only a truck parked along the south side of the street which he avoided by making a slight turn. The street was otherwise clear of vehicles.

Across the middle of Curry Avenue, however, was the steel cable. It was one-half inch in diameter and its color was black according to all the witnesses, having become so through accumulated grease and dirt. It lay on the black macadam road, which was also dusty, until hoisted by the pull of the winch. According to Guthrie, at the moment of collision the cable was three to four feet above the road directly perpendicular to the course of traffic on Curry Avenue. Physical examination showed that the cable had struck the headlights on the delivery truck.

Burns, McKee's employer, had intended that the steel beams would be hauled by truck across the street rather than by winch and cable. He had instructed McKee to put out flags [4] because he saw that the intersection was a "dangerous" one. Burns told McKee: "George, put out your flags. Be sure to put out your flags." No flags or similar warning were put out, however.

A minute or so before the accident, Henery, a nephew of McKee, 17 years of age, was sent out at McKee's direction to "flag". Henery wore a T undershirt and trousers and carried nothing to indicate that he was "flag" man. He proceeded diagonally from the beam which was then lying 10 to 15 feet north of Curry Avenue and thence along the north side of this street toward the "T" intersection. Henery's exact position and his efforts to "flag" are in dispute, and the speed of the oncoming bread truck is likewise controversial. McKee had told Henery to flag "just before" [5] telling Guthrie to start the winch. Guthrie had crossed the street to the cab of the winch truck to operate the winch. The cable either had merely tightened or had already tightened and had moved the beam three to four feet.

No one saw the approach of the truck except Henery [6] and no one observed Henery's movements. Henery's testimony as will appear, was contradicted by a prior version attributed to him. It is clear, however, that Henery gave no warning until the bread truck reached the "T" intersection and indicated by its action that it was going to enter Curry Avenue rather than follow the normal course of traffic which turned off Depot into Tannery Streets. Henery's evidence was consistent on this point. The truck, therefore, received no warning signal until it was within at least a 100 feet of the point of collision.

At the trial Henery maintained that the truck was traveling 40 miles per hour and continued this speed to the point of impact; that he first saw the truck when he was two or three feet north of Curry Avenue about "half-way" (which is 50 feet) toward the intersection; that he stepped to the edge of Curry Avenue and waved his left arm several time at one second intervals [7] when he saw the truck fail to turn

---

4. Several flags were at all times available in either the winch truck or another truck McKee had employed.

5. Most of the witnesses used this phrase.

6. Neither Robert Burns nor Hoffer were looking.

7. He so demonstrated in the court room.

to its right; and that he waved both hands and shouted when the truck came abreast of him. Henery conceded that he was standing near a telephone pole. This pole, according to police measurements, was not 50 feet toward the intersection but only 24 feet.

Curry Avenue has no posted speed limit. The posted speed limit on Depot Street, however, is 25 miles per hour. Wheeler testified that he was proceeding at a rate of 25–30 miles per hour, 10 to 15 miles an hour below the speed estimated by Henery.

On the witness stand Henery did not recall whether after the accident the police (Goetz and his assistant Herzing) had asked him to take the exact position in which he was at the time of the accident, nor did Henery remember what statements he had made at the coroner's inquest held on the afternoon of the day of the collision. Goetz, corroborated by Herzing, stated that Henery had accompanied them to the scene of the accident after returning from the hospital to which McKee had been taken; that Henery had posed for them in the exact position in which he was at the time of the accident; that this position was "within a foot or two of the pole" and on "the east side" (thus perhaps behind the pole); and that when asked what he had done to "flag" Henery had responded that "as the car went by he dropped his hand, or he raised his hand". Goetz stated further that at the coroner's hearing [8] Henery testified that he did not know the speed of the truck; that Henery had said he was standing "twenty to twenty-five" feet from the cable at the time of the accident; and that Henery had related in substance that he was "about three feet from the telephone pole and tried to flag the truck by motioning".

Simple mathematics show that if, as Henery has testified, the delivery truck was proceeding at a rate of 40 miles per hour, it was moving at the rate of 58.6 feet per second. If Henery was, as he said, halfway or fifty feet toward the intersection he was fifty feet from the delivery truck and he had less than a second in which to act. If this be so, Henery probably could not have completed one full motion of his left arm at "one second intervals" before the truck passed him.

■ The court below correctly charged according to Pennsylvania law that "a driver has a right to assume that a road is free of obstructions which he, as a reasonable and prudent driver, could not be reasonably expected to see unless some kind of effective· and timely warning is given him of the presence of this obstruction"; that "It is the duty of anyone engaged in an extraordinary use of a highway to give warning of any dangerous condition created"; and that "The driver of original defendant's truck had a right to presume that the street was free from a temporary obstruction." See Brown v. Krakowski, Pa., 68 D. & C. 501, 516, and cases therein cited; Blashfield, Cyclopedia of Automobile Law and Practice, Vol. 1, § 691; 40 C.J.S., Highways, § 268; 25 Am. Jur., Highways, § 272. Jamestown's contention, however, is that the evidence of a timely warning was so insufficient that the question should have been withdrawn from the jury.

■■ Taking those inferences from the evidence most favorable to the plaintiff, as we must, the jury was entitled to conclude that Henery was standing in plain view of the truck not 50 but 25 feet from the cable and that he made one or more motions with his left arm beginning when the truck was 100 feet distant. Had Wheeler been traveling 25 miles per hour, he could have stopped the truck [9] in time to avoid the accident. It is true that Wheeler would have had to have acted promptly,[10] but under the facts the jury in imposing

---

8. The stenographer at the coroner's hearing took shorthand notes, but only transcribed the testimony in narrative form. The stenographer was not available to testify and her narrative was not admitted in evidence.

9. The stopping distance required for vehicles proceeding at the rate of 25 miles per hour is about 70 feet.

10. Wheeler had about two seconds in which to stop the truck. The critical distance was twenty-nine feet and this distance would have been transversed at 25 m.p.h. in 1.95 seconds.

liability on Jamestown was not acting unreasonably. We have been cited to and have found but one decision wherein it was ruled as a matter of law that a warning, when an attempt to warn was made,[11] was inadequate. See Bush v. Goodno, 233 App. Div. 152, 251 N.Y.S. 271, 259 N.Y. 538, 182 N.E. 171. Contrast the cases collected in 40 C.J.S., Highways, § 281, at page 339. In Pennsylvania the adequacy of a given warning is a jury question. This is the tenor of the reported decisions and we are required to follow the Pennsylvania law. See Geiger v. Dowdy, 111 Pa.Super. 485, 170 A. 420; Clamper v. Philadelphia, 279 Pa. 385, 124 A. 132; Mayhugh v. Somerset Telephone Co., 265 Pa. 498, 109 A. 211; cf. Rodgers v. Shaler Twp., 164 Pa.Super. 558, 67 A.2d 806.

◼ Jamestown further contends that McKee was guilty of contributory negligence. McKee, as we have stated, was the foreman in charge of the construction work and it was his duty to give adequate warning of any danger arising therefrom. He disregarded his employer's, Burns', instructions and failed to put out the warning flags which were readily available. But McKee did send out a flag man, Henery. McKee was entitled to assume that Henery would properly fulfill his duties as a flag man. The record shows that McKee waited some time before giving Guthrie the signal to operate the winch for Guthrie had time to cross the street to the cab of the winch truck and Henery had opportunity to proceed and did proceed 25 or more feet toward the intersection. We cannot say that McKee's efforts to warn the truck were so unreasonable or inefficient that contributory negligence was demonstrated as a matter of law. The question of McKee's contributory negligence, like Jamestown's negligence, was for the jury.

◼ The other assignments of error, hereinbefore referred to, remain for discussion. One of these relates to the fail-ure of the trial judge to charge the jury in accordance with Jamestown's "Requests for Charge", Nos. 4 and 5. These requests were only elaborations of the rule that Wheeler as the driver of the delivery truck was entitled to warning. We concur in the view expressed by the court below that to have so charged would have been more needless repetition of the charge actually given. See 101 F.Supp. at page 796. See again the three statements in the charge quoted at an earlier point in this opinion.

◼ Jamestown asserts also that the trial judge erred in refusing to admit into evidence the official report of the accident compiled by Police Chief Goetz.[12] The report consists of a summary of statements made by witnesses to the accident and some photographs taken immediately after the accident. The refusal to admit the statements was error on the part of the court below. The report was made up by Chief of Police Goetz in his official capacity and was therefore made in the "regular course" of his business. See 28 U.S.C.A. § 1732, and Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 183 F.2d 467, 472–473. But the error was not prejudicial for Goetz testified competently as to all pertinent matters contained therein. The failure to admit the report, therefore, does not constitute ground for reversal. See Barnett v. Aetna Life Ins. Co., 3 Cir., 139 F.2d 483, 485–486, certiorari denied 321 U.S. 781, 64 S.Ct. 637, 88 L.Ed. 1073; Perrone v. Pa. R. R. Co., 2 Cir., 143 F.2d 168, 170; and Strickland v. Humble Oil & Refining Co., 5 Cir., 140 F.2d 83, 85, certiorari denied 323 U.S. 712, 65 S.Ct. 37, 89 L.Ed. 573, rehearing denied 323 U.S. 812, 65 S.Ct. 111, 89 L.Ed. 647.

◼ Jamestown further contends that the verdict was excessive and that the court below failed to charge correctly as to the meaning of the phrase "present worth" of the sum required to compensate the plaintiff and those whom she represents. We find the judge's charge to have been ade-

---

11. In Brown v. Krakowski, Pa., 68 D. & C. 501, heavily relied on by the defendant, the court held that a "Men Working" sign was not a warning of a low hanging wire.

12. Original Defendant's Exhibit "D" (and "A", "B" and "C").

quate as a definition of "present worth". Nor do we find the verdict so large "as to shock the judicial conscience". We think that the instant case is not strong enough to require us to substitute our judgment for either that of the trial court or the jury. See Leverton v. Curtis Publishing Co., 3 Cir., 192 F.2d 974, 978; Trowbridge v. Abrasive Co. of Philadelphia, 3 Cir., 190 F.2d 825, 830.

Last, it is contended that the court below committed error in directing the jury to bring in a single verdict in a lump sum. The plaintiff in her complaint against Jamestown set up two causes of action, viz., a survival action brought under the Act of June 7, 1917, P.L. 447, § 35(b), as amended by the Act of July 2, 1937, P.L. 2755, § 2, 20 P.S.Pa., Ch. 3, App., § 772, and a wrongful death action brought under the Act of April 15, 1851, P.L. 669, § 19, 12 P.S.Pa. § 1601. See also 12 P.S.Pa. §§ 1602-4. The plaintiff did not file a complaint against the third-party defendant, Burns. Burns was brought on the record, as we have stated, by Jamestown. The plaintiff did not seek to amend her complaint and to assert a cause of action against Burns. Nor was she entitled to do so under Rule 14(a), F.R.C.P., following the 1946 amendment, for Burns is a citizen of Pennsylvania. See note 3 cited to the text in Patton v. B. & O. and Duquesne Slag Products Co., 3 Cir., 197 F.2d 732, 734. The instant situation in these respects bears a close resemblance to Patton.

In the Patton case we said, "In an action for wrongful death the recovery, if any, passes to a limited group of beneficiaries as defined by statute. The recovery is apportioned among the beneficiaries in accordance with the intestate laws of Pennsylvania without regard to a decedent's will and the sum recovered is not available to creditors of the decedent. See the provisions of the Act of April 26, 1855, P.L. 309, § 1, as amended by the Act of April 1, 1937, P.L. 196, § 1, 12 P.S.Pa. § 1602. In a survival action the recovery enures for the benefit of the decedent's estate. Not only is it available to creditors, but likewise it passes in applicable cases to legatees pursuant to will. In re Davis' Estate, Pa., 56 D. & C. 359; see Suders v. Campbell, M.D.Pa., 73 F. Supp. 112, 115; Funk v. Buckley & Co., Inc., 158 Pa.Super. 586, 591, 45 A.2d 918, 921. Cf. Lucabaugh's Estate, Pa., 74 D. & C. 68."

In the instant case, unlike Patton, the charge of the court as to the liability of Jamestown was adequate to sustain the verdict against that defendant and hence the adverse judgment against Jamestown as a joint tortfeasor may not be set aside on the ground of the inadequacy of the charge.

Also in the instant case there is a very strong suggestion that McKee died intestate and that all his debts have been satisfied. A statement to such effect was made on the plaintiff's brief[14] and was not contradicted by Jamestown's counsel. Moreover, in interrogation by this court during the course of the oral argument as to whether or not McKee had died intestate and had left no debts in his estate, counsel for Jamestown, as well as counsel for the plaintiff, stated that this was so. Nonetheless we are of the opinion that if McKee died intestate and left no debts in his estate, as we believe to be the case, this must appear in the record made by the court below. On the other hand, a new trial should be avoided if possible. In so stating we are not unmindful of the fact that the case was tried by a jury. We think that we should employ the technique suggested in Cramp Shipbuilding Co. v. United States and Duffy Construction Corp., 3 Cir., 193 F.2d 469, 470, in order that a desirable result may be reached. Accordingly we will retain jurisdiction of the appeal but will not now pass on the judgment appealed from. The record will be remanded.

On remand the question as to whether or not McKee died intestate leaving no debts in his estate may be raised by an appropriate motion or by the court sua sponte on an analogy to Rule 56, F.R.C.P., "Summary Judgment". The court below may receive evidence and may examine it to determine whether there is a genuine issue of fact proper for trial. If the court below shall

14. See the plaintiff's brief at p. 45.

determine that there is no such issue it shall make an order to such effect. If it shall decide to the contrary, it shall also make an appropriate order. The record thus made, duly certified, shall be transmitted by the Clerk of the court below to the Clerk of this court. If the determination of the court below is that there is no genuine issue of fact as to McKee's dying intestate and leaving no debts in his estate, and this court shall conclude that such determination is warranted by the facts and the law, we, as presently advised, will affirm the judgment of the court below; otherwise, a new trial will be ordered.

As to the verdict and judgment against Burns, we are without power to set them aside for no appeal was taken by Burns.

Accordingly the record in the instant appeal will be remanded to the court below with directions to proceed as set out in this opinion.