## ST. LOUIS SOUTHWESTERN RY. CO. OF TEXAS v. ANDERSON et al. (No. 8010.)

(Court of Civil Appeals of Texas. Dallas. Oct. 26, 1918. Rehearing Denied Nov. 30, 1918.)

1. APPEAL AND ERROR ☞715(2) — RECORD — "FUNDAMENTAL ERROR"—AFFIDAVITS.

A fundamental error is one apparent upon the face of the record, and affidavits showing error, being no part of the record, cannot be considered.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fundamental Error.]

2. ABATEMENT AND REVIVAL ☞27—DEATH ☞42—NECESSARY PARTIES—JURISDICTION.

In a suit by the wife and child of deceased to recover for deceased's wrongful death, the nonjoinder of deceased's father is not jurisdictional, but will abate the suit when made to appear of record.

3. DEATH ☞76 — CAUSE OF DEATH — EVIDENCE.

Evidence held to show that the death of plaintiff's intestate was caused by injuries resulting from intestate's being thrown from a hack to the ground when defendant's locomotive struck the hack.

4. RAILROADS ☞278(6) — INJURY AVOIDABLE NOTWITHSTANDING CONTRIBUTORY NEGLIGENCE.

Where those operating a locomotive discovered a hack standing too close to the track at a station, and failed to use every means consistent with the safety of the train and its operatives to avoid collision, the railroad company is liable notwithstanding contributory negligence.

5. NEGLIGENCE ☞83 — LAST CLEAR CHANCE.

The principle of last clear chance has no application in the absence of actual knowledge by defendant of danger.

6. RAILROADS ☞282(3) — NEGLIGENCE — DISCOVERED PERIL—BURDEN OF PROOF.

The burden of proof is upon the injured plaintiff to establish that defendant's employés operating its train actually discovered plaintiff's peril in time to have avoided the injury.

7. RAILROADS ☞282(5)—DISCOVERED PERIL—KNOWLEDGE—EVIDENCE.

Evidence held sufficient to sustain a jury's finding that operatives of defendant's locomotive discovered that plaintiff's intestate's horses had backed his hack upon the track about 150 feet ahead of the train, and failed to use the means at their command to avoid the injury.

8. APPEAL AND ERROR ☞731(1) — ASSIGNMENTS—EXCESSIVE VERDICT.

An assignment that "the verdict of the jury as to A. is excessive" is too general for consideration.

9. DEATH ☞99(4)—EXCESSIVE VERDICT.

Where a hack driver was killed by a collision with defendant's locomotive, a verdict for $4,500 to his wife and $3,000 to his minor son for pecuniary loss till he became of age held not excessive.

10. DEATH ☞86(2)—MEASURE OF DAMAGES—WIFE AND SON OF DECEASED.

The wife and son of deceased are entitled to recover, as pecuniary loss for deceased's wrongful death, not only the amount he might have contributed to their support, but the value of his attention, care, and counsel to the wife, and of his intellectual and moral advice, education, and training to his son.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

11. APPEAL AND ERROR ☞1050(2) — HARMLESS ERROR—IMMATERIAL EVIDENCE.

Where, in an action by the wife and minor son of deceased to recover for deceased's wrongful death, evidence as to deceased's advice to the son was immaterial to any issue, its admission must be held harmless.

12. TRIAL ☞114 — ARGUMENT OF COUNSEL — DAMAGES.

Remark of counsel that the jury might consider "the fatherly care the child was entitled to receive," "up to the date it was twenty-one years of age," in estimating pecuniary loss to child by wrongful death of father, *held* legitimate argument.

Appeal from District Court, Hill County; Horton B. Porter, Judge.

Suit by Mrs. John Anderson, on her own behalf and as next friend of Floyd Anderson, a minor, against the St. Louis Southwestern Railway Company of Texas, to recover for the wrongful death of John Anderson. Judgment for plaintiffs, and defendant appeals. Affirmed.

E. B. Perkins, of Dallas, and Scott & Ross, of Waco, for appellant.

Shurtleff & Cummings, of Waco, for appellees.

TALBOT, J. The appellee Mrs. John Anderson, the surviving wife of John Anderson, deceased, in her own behalf and as next friend for Floyd Anderson, the minor child of herself and the said John Anderson, brought this suit against the appellant to recover damages sustained by them on account of the death of the said John Anderson occasioned by the acts and negligence of the servants of appellant in propelling the locomotive attached to one of its trains against the hack of the said John Anderson at Hillsboro, Tex., causing the said Anderson to be thrown from the seat of said hack to the ground, alleging that the injuries resulting from said acts of appellant's servants and fall caused the death of the said John Anderson; that the appellant's servants in charge of said locomotive and train discovered the peril of the said John Anderson in time to have avoided striking his hack by the use of the means at their command, but failed to use the care required of them by law to do so. The defendant pleaded a general denial, and specially that the deceased, John Anderson, was engaged in driving a hack, and habitually met the incoming passenger train in the city of Hillsboro, where the accident is alleged to have taken place, and that he would and did leave his hack standing with the rear of the same near the defendant's railway track, by and over which said locomotive and passenger coaches were moved in arriving at the depot; that the passenger coaches would pass within a few inches of the rear of his hack; that on the occasion of the alleged injuries, immediately preceding the arrival of the defendant's passenger train, and as it approached the passenger depot, the said John Anderson drove his hack and team to defendant's depot, turned his team so they would face east, with the rear of his hack within a few inches of the east rail of defendant's railway track, over which its locomotive and passenger train complained of by plaintiff were moving at said time, stopping at the usual and accustomed place where deceased was in the habit of stopping; that as the train in question approached the depot and the deceased's hack, the deceased at the time being upon the driver's seat towards the front end of the hack, with the lines in his hands, managing the horses hitched to the hack, said horses became frightened at the approach of an automobile, and suddenly caused the hack to move backwards, so that the rear wheels thereof came in contact with the "rear stirrup and east end of the wooden pilot beam on defendant's engine," which contact was so sudden that it was impossible for the engineer operating the locomotive to stop the same before striking and smashing the rear wheel of the hack; that the deceased either jumped off said hack or fell therefrom to the ground; that it was dark at the time of the accident; that the engineer was in the cab on the right-hand side of the locomotive, and the deceased was on the left-hand side of the railroad track; that, on account of the length and size of the boiler of the locomotive, the engineer could not see what was transpiring on the east side of the track, and did not see deceased's hack or team after deceased stopped at his usual and customary place, "and where, had said hack remained, it would have been entirely safe from any injury by defendant's locomotive or train." Appellant further alleged that the deceased, John Anderson, was guilty of contributory negligence in leaving his hack, with the team hitched to it, so close to appellant's railroad track and passing trains, with full knowledge of the disposition of said horses and the probability of their becoming frightened at the approach of automobiles or vehicles of any kind; that appellant's employés relied upon the said Anderson to place his hack at a sufficiently safe distance from its track to permit the passage of its locomotive, and to take such precautions as were necessary to prevent his team from backing the hack so as to come in contact with its locomotives; that, as the locomotive and train causing the alleged injury to the deceased approached the station at Hillsboro, the engineer was at his post of duty on the right-hand side of the locomotive, "which was the opposite from the location of said hack, and looking forward to see that the track in front of his locomotive was clear, as shown by his headlight," which threw a light immediately forward and directly on the track in front of the locomotive, and had

no knowledge whatsoever of the movement of the deceased's hack or team, and no knowledge that the hack was being backed until the accident occurred, at which time he immediately applied his air and stopped the engine in a few feet.

The case was submitted upon special issues, and the jury found that the deceased, John Anderson, was in a position of imminent peril before defendant's train reached the point where his hack was situated; that such perilous position was known to the servants of defendant in charge of the locomotive that struck the hack; that said servants knew of the imminent peril of the deceased in time to have stopped said locomotive and train, by the use of the means at their command, with safety to themselves and persons on the train, and avoided injury to the deceased. The jury further found, in answer to questions propounded by the court, that the failure of appellant's servants to stop the locomotive and train before striking the deceased's hack was negligence, and that such negligence was the proximate cause of the death of the deceased, Anderson; that the collision or striking of the deceased's hack was not an unavoidable accident; that the deceased, John Anderson, could not, after he was in imminent peril, have extricated himself from such peril; that $4,500, if paid in cash now, would fairly compensate Mrs. John Anderson for the pecuniary loss sustained by her on account of the death of her husband, and that $3,000, if so paid, would compensate Floyd Anderson for the pecuniary loss sustained by him on account of the death of his father, until he arrived at the age of 21 years. Upon the foregoing findings judgment was rendered in favor of appellees, respectively, for sums, stated, and, appellant's motion for a rehearing having been overruled, it appealed.

[1, 2] Appellant presents, first, what it terms "Appellant's Assignment of Fundamental Error." By this assignment it is asserted, in substance, that the district court was without jurisdiction to hear and determine this cause, and hence this court has not jurisdiction to entertain the appeal, because the father of the deceased, who he left surviving him in addition to the appellees herein, was not a party to the suit, nor was the suit brought for his use and benefit. The alleged fact that the deceased left surviving him his father does not appear in any way in the record sent to this court. The only way appellant seeks to establish and show such a fact is by ex parte affidavits taken and filed for the first time in this court long after the appeal was perfected and the transcript sent here. A fundamental error is one apparent upon the face of the record. The affidavits referred to constitute no part of the record in this cause, and the fact, if it be a fact, that the deceased, John Anderson, left his father surviving him not appearing from the record, the error charged and sought here to be assigned is not fundamental. The matter called to the attention of the court in the assignment is not jurisdictional, but a nonjoinder of parties, and the affidavits filed here to show the want of a necessary party to the suit cannot be considered for that purpose or for any other purpose. Had the evidence in the trial of the case developed the fact that the deceased had a father, "the proceedings should have been arrested until he was made a party, or the petition so amended that the suit would proceed for his use as well as that of the other beneficiaries." Railway Co. v. Culberson, 68 Tex. 664, 5 S. W. 820. It was not, however, disclosed by the evidence introduced in the trial court that the deceased had a father. Nor did appellant, by plea in abatement or by any form of objection whatever, complain of the nonjoinder of the father, and suggest or urge that the suit be arrested until he was made a party or included by proper averments in the benefit of the action. It not being apparent of record that the deceased left his father surviving him, appellant is in no position to urge in this court his nonjoinder as a party to the suit, and the assignment under consideration will be overruled. Illustrative of the correctness of this ruling are the following cases, which hold that if the nonjoinder of parties is not apparent of record the question cannot be raised by demurrer: March v. Walker, 48 Tex. 372; Cotton Press Co. v. Bradley, 52 Tex. 587.

[3] The first assignment of error touching the merits of the case is, in substance, that the verdict of the jury is contrary to the law and the evidence, in that there was no evidence that the death of the deceased, John Anderson, was caused by the appellant, since there was no evidence that his death resulted from the fall complained of in appellees' petition. We do not concur in this view of the evidence. We think the evidence contained in the record sufficient to show that the death of John Anderson was the result of injuries received in the accident mentioned in the petition. The witness Louis Cliett, who saw the accident, among other things testified that the pilot beam in front of the engine struck the rear wheels of Anderson's hack, and "tore up the left hind wheel, and knocked Anderson, whirling him off on the ground"; that his side hit the ground near the edge of the railroad track, and that the ground was hard where he fell. He further said that Anderson laid there on the ground after he was knocked off his hack until he was picked up; that he (Anderson) did not get up himself; that he (witness) left after Anderson was picked up, and that when he left Anderson did not seem to be conscious, but seemed to be gaining consciousness. It was shown by another witness that he saw Anderson that evening before the accident, and again saw him that night about 10 o'clock after the accident, at his home in

bed; that he seemed to be suffering pain at that time, and died about 48 hours after the accident; that so far as he knew Anderson never left the bed after he was taken there, soon after he was injured, until he died. E. B. Phelps, an undertaker, testified that he was called on after Anderson's death to prepare the body for burial; that he undressed him, and found that his side "was distended a good deal, and the right side sunk in, as though it was mashed in, and on his back, along about the lumbar region, or just in the pit of the back, was a dent about the size of your thumb and about a quarter of an inch deep"; that the left side was discolored, but that the right side was not. Mrs. John Anderson, the wife of the deceased, testified:

"He [meaning John Anderson] came home to supper about 6 o'clock. I walked down to the street with him as he was going to the barn. I next saw him about 9:30 or 10 o'clock, at home. He walked home, so far as I know, and he staggered in the house, and was complaining when he got there. I helped him undress, and put him to bed, in about two or three minutes after he got home, and he remained in bed from that time until his death. He got home between 9:30 and 10 o'clock Friday night and died Sunday night following. I noticed when he undressed the Friday night he came home, just after he was injured, and he had a sunk place in his right chest. Before that injury had not had that condition, but had always been strong and healthy before that time. I had never seen the sunk-in condition in his right chest before that night."

Dr. S. F. Jones testified:

"I saw him [John Anderson] that night after he died, but not as an attending physician on him. I did not make a close examination, but saw the right chest was crushed in about the region of the third or fourth rib, and the left chest was very much congested and dark, in bad condition, and there was a place in the back on the left side. The injuries I saw on his body were such as would probably produce death. I was there when the undertaker undressed him. I observed a crushed-in condition on the right chest, and a swollen condition on the left side of the chest, and very dark and very much swollen. The left chest was dark and swollen and very much congested, and the right chest was sunk in about the region of the third and fourth rib. I don't know if it was crushed in or not. I don't know how long that condition had existed there, and don't know what caused it."

There is evidence in the record tending to show that the injuries received by the deceased from being thrown from his hack by the collision with appellant's locomotive were slight; but, on the other hand, there is ample evidence to sustain the jury's finding that they were serious and resulted in Anderson's death.

[4-7] Appellant's assignments of error, from the fifth to the twelfth, inclusive, are grouped in the brief, and relate to the issue of discovered peril submitted to the jury by the court's charge, and the substance of them is that the evidence fails to show any facts which constitute a foundation for the doctrine of discovered peril, since the undisputed evidence shows that the deceased was not in a position of peril until the very instant of the accident, and appellant's engineer was at the time of the alleged injury in full charge and operation of the engine in question, and there is no evidence that "he ever at any time saw the deceased or the hack upon which he was situated, either before, at the time, or after the accident," and since there is no evidence which shows that either the appellant's engineer or fireman realized that the deceased was in imminent danger of suffering any injury at the time and place mentioned in the appellees' petition. Under these assignments the appellant advances several propositions which it is assumed embody the principles of law upon the subject of discovered peril. These propositions will not be copied into this opinion, and we need not stop to consider whether or not all the views expressed in them are correct. It is sufficient, we think, to state what we understand to be the established rules of law upon the subject by our decisions. It is the settled law of this state that, if those operating a railway engine discover the peril of one in danger upon or near the railroad track in time to avoid injuring him, a new duty is imposed of using every means consistent with the safety of the engine and those operating it to avoid striking and injuring him, and a failure so to do would render their employer liable, notwithstanding the injured party may have been guilty of contributory negligence in being exposed to the peril. The principle, however, has no application, in the absence of actual knowledge, on the part of the person inflicting the injury, of the peril of the party injured, in time to avoid the injury by the use of the means and agencies then at hand. If he had no such knowledge the new duty was not imposed, though it be clear that by the exercise of reasonable care he might have acquired same. So that the burden of proof is upon the party seeking to recover for a breach of such new duty to establish, not that the operatives of the engine might, by the exercise of reasonable care, have acquired such knowledge, but that they actually possessed it. Railway Co. v. Breadow, 90 Tex. 26, 36 S. W. 410.

It was not necessary to sustain a charge of negligence on the part of the appellant, on the doctrine of discovered peril, that its operatives of the engine that struck John Anderson's hack actually knew or realized that injury would result to the said Anderson if the train was not stopped. The duty to use the means at their command to stop the train with the view of avoiding injury to him instantly arose when they discovered, if they did so, that he was in a position of such danger as that he would probably be injured if the train was not then stopped. Railway Co. v. Aston, 179 S. W. 1128.

But there seems to be in the case little or no controversy as to the law of discovered peril. The question, tersely stated, is, was the evidence bearing on that issue sufficient

to authorize its submission to the jury? We have reached the conclusion that 'the question should receive an affirmative answer, notwithstanding the positive testimony of the operatives of the locomotive in question is to the effect that they did not discover the position and peril of the deceased until the instant of the collision, and too late to stop the engine and avoid striking his hack. It is not incumbent upon the jury to accept all the testimony of any witness, but they may believe and accept a portion of it, and disbelieve and reject the remainder, or they may discredit and discard all of it, if they do not act arbitrarily and without any reason for so doing. It is their peculiar province to pass upon the credibility of the witnesses, and determine the weight, if any, to be given to their testimony. Again, it is not essential that the issue of discovered peril be raised by direct evidence. It may be done by circumstantial evidence alone, and, as above indicated, notwithstanding there is positive testimony denying the existence of the facts necessary to establish such issue. The evidence is practically without dispute, or amply sufficient to show, that the railroad track of appellant was straight for about the distance of two blocks in approaching the depot at Hillsboro, where the accident resulting in Anderson's injury and death occurred, and that appellant's employés in charge of the engine and train which struck the deceased's hack were keeping a lookout; that the engine was equipped with a strong, bright light, which illuminated the place where the deceased's hack was standing and the railroad track for some distance beyond the depot. It was also shown that the deceased's hack was standing at first within 2 or 3 feet of the track, and was backed onto the track by his frightened team when the train was at least 150 feet away. The engineer testified that at the time of the collision he was sitting on the right-hand of the engine, which was the west side, and in charge of the engine; that from his position at the time of the collision he could not see Anderson's hack because the boiler of the engine was between him and the hack; that he did not see Anderson, the deceased, at the time of the collision, and did not know what was said and done. He further testified, however, that previous to the collision, at a distance of from 100 or more feet from the place of the accident, he saw Anderson's hack crossing the railroad track from the west to the east side, and stop at a point where the hack cleared the train, and that when he last saw the hack before the collision it was in the clear; that he saw Anderson just a few minutes after the collision; that he was then on the east side of the track and some closer to it when he saw the hack before the accident; that he (Anderson) was trying to regain his footing when he saw him, and that Conductor Wilks was assisting him to his feet; that he did not talk to An-

derson. This witness further testified 'that there were people at the depot, but he could not estimate how many; that he could not say how close they were to the railroad track, but that they were far enough off to clear the train. The witness Cliett testified, without contradiction, that the train in approaching the depot when the accident happened was running about 15 or 16 miles an hour; that the rear wheels of Anderson's hack were at this time east of the railroad track, clear of the track 2 or 3 feet; that Anderson's horse hitched to the hack on the right-hand side was nervous and cutting up; that Anderson was trying to control the team, but it backed the hack onto the railroad track anyway. He further testified that at the time the horses were cutting up, and Anderson trying to control them, he saw the train approaching, and that it was then 50 yards, or 150 feet, away; that when the hack got back on the railroad track there was nothing to prevent the persons on the engine from seeing the hack at that time; that there was a headlight on the engine, and that "it was light where John Anderson was from the electric light close by there shining." He further said:

"At the time I saw Anderson's team in that frightened condition, I looked down the track and saw the train coming. I could see one man on the engine on the left-hand side next to me. The train was going south. I couldn't say which way he was looking, but his face was forward— the way the train was going. Yes; John Anderson and his hack were north of the depot."

The witness John Evans testified, without contradiction, that he had been a locomotive fireman for a number of years, and that he had been an engineer for nine years; that a train such as the train in question, running at the rate of 15 or 16 miles an hour, could have stopped in from 20 to 25 feet; and that such a stop could be made with safety to the passengers and train employés. The engineer testified that when he discovered there had been a collision he stopped the train in a few feet.

From the facts and circumstances shown by the foregoing testimony we think the jury had the right to infer, as they did, that the operatives of appellant's engine discovered the deceased, Anderson, in a position of peril in time, by the use of the means at their command, to have avoided injury to him. The evidence, as has been seen, discloses that the railroad track, in the direction from which the train was approaching, was straight for a distance of about two blocks from the depot. The engine was equipped with a strong, bright headlight. Besides, the place where Anderson stopped his hack was lighted by an electric light near by. When the engine was still 150 feet away Anderson's team began backing the hack onto the railroad track. At this time, according to the undisputed testimony of the witness Cliett, the fireman on the

engine was sitting with "his face forward the way the train was going." That the fireman was looking in the direction of the depot is shown by his own statement to the effect that, as the train approached the depot, he looked out the window and saw the usual crowd of people waiting at the depot, some walking and others in vehicles, and he denied, however, that he saw the deceased or his hack. Appellant in its answer alleged that, as the train approached the depot at Hillsboro, the engineer was at his post of duty on the right-hand side of the locomotive, and looking forward to see that the track was clear; and the engineer testified that as the train approached the depot he saw people there, and when a hundred feet or more from the place of the accident he saw Anderson's hack cross the railroad track and stop on the east side, near the track. Cliett testified that when the train was about 150 feet from the place of the accident the hack was backed onto the track. Clearly, the jury, under the facts and circumstances shown, had a right to disbelieve the testimony of the engineer and fireman to the effect that they did not see Anderson and his hack at or about the time the hack was being backed onto the railroad track, and did not discover that Anderson was in danger of being struck by the engine until almost at the very instant of the collision, and to draw the reasonable inference that they did discover his peril when the engine was about 150 feet distant from the place of the accident, and in time, by the use of the means at their command, to have avoided the accident. Railway Co. v. Finn, 107 S. W. 94; Railway Co. v. Tinon, 117 S. W. 936; Brown v. Griffin, 71 Tex. 657, 9 S. W. 546; Sanches v. Railway Co., 88 Tex. 118, 30 S. W. 431. In the case of Brown v. Griffin, supra, it is said:

"It is complained that the court erred in charging, in effect, that the plaintiff could recover, although he put himself in a position of danger, if the person in charge of the engine saw him in time to warn him of danger by giving the signal and failed to do it. It is claimed that there was no evidence to warrant this charge. Upon the theory that the jury were bound to believe the fireman, who swore he did not see plaintiff, this may be true. But the proof is that he was upon the engine operating it, and that there was nothing in front of it to obstruct his view of the track. The jury might have presumed from this that he did see the plaintiff. Is the court bound to assume that this presumption is wholly destroyed because a witness swore to the contrary?"

[8, 9] It is assigned that the verdict of the jury is excessive. Appellee objects to a consideration of the assignments on the ground that they are too general. The form of the assignments is: "The verdict of the jury as to Mrs. John Anderson is excessive." "The verdict of the jury as to the minor Floyd Anderson is excessive." The objection should be sustained. It has frequently been held in this state that similar assignments are too general and not entitled to consideration. The question sought to be raised is one of fact, and appellant should have pointed out in its motion for a new trial in the court below, which constitutes its assignments of error here, wherein the verdict is excessive. This it did not do, but the assignment is a general complaint as to the amount of the verdict. Railway v. McVey, 81 S. W. 991; Railway Co. v. Matlock, 141 S. W. 1072; Railway Co. v. Fesmire, 150 S. W. 201; White v. Wadlington, 78 Tex. 159, 14 S. W. 296; City of Galveston v. Devlin, 84 Tex. 326, 19 S. W. 395. From our investigation and knowledge of the record, however, we do not believe we would be warranted in holding the verdict excessive in respect to either of the appellees.

[10, 11] The special charge requested by appellant and refused by the court, and made the basis of the fifteenth assignment of error, in our opinion, furnishes no sufficient ground for a reversal of the case. The charge is, in substance, that by "pecuniary loss" is meant such sum of money as would probably have been paid by the deceased, John Anderson, to his wife and son, or which sum or sums of money would probably have been earned by said Anderson and expended in the maintenance of his wife and son, and that in determining the pecuniary loss of the son the jury would only consider the time from the death of the father to the date of the son's arrival at the age of 21 years. The special charge, it seems to us, presented an erroneous test for the determination of the amount to be allowed to appellees. Their pecuniary loss included not only such contributions from the earnings of the deceased as he might make toward their support and maintenance, but also the value of his attention, care, and counsel to his wife, and the value of his intellectual and moral advice, education, and training to his son. Railway Co. v. Higginbotham, 173 S. W. 482. Besides, it does not appear that the refusal of the special charge was calculated to, and probably did, cause the rendition of an improper verdict. The jury found, in response to appropriate questions propounded to them, that it would require the respective sums awarded to appellees, "if paid in cash now," to fairly compensate them for the pecuniary loss sustained on account of the death of the husband and father. The action of the court in permitting Mrs. Anderson, over the objection of appellant, to state that she had heard her husband advise his son, Floyd Anderson, to be a good boy, may be admitted to be error, because it did not tend to prove any issue in the case and was therefore immaterial. But it is inconceivable that the error could have prejudiced the rights of appellant; we therefore hold that it was harmless.

[12] In discussing to the jury the amount to be awarded to Floyd Anderson, the

minor son, counsel for appellees used this language: "In the case of the child you can take into consideration more than the money, but the fatherly care the child was entitled to receive from the father up to the date it was 21 years of age." The appellant objected to these remarks of counsel, and requested the court to instruct the jury not to consider them, which request was refused, and the refusal is assigned as error. We think the assignment should be overruled. We fail to see wherein the remarks complained of could have been prejudicial to the appellant. It is true his damages were limited to pecuniary loss, but, in determining the amount of such loss, the jury had a right to consider the care, advice, and education that Floyd Anderson might have received from his father, but for his death, up to the time he reached his majority. The remarks objected to conveyed nothing more than this to the jury, and constituted legitimate argument.

The assignments have been carefully considered, and because none of them disclose reversible error the judgment is affirmed.