**Pearl Elizabeth THOMAS, Administratrix of the Estate of Lewis Samuel Thomas, deceased, Plaintiff,**

v.

**CONEMAUGH BLACK LICK RAILROAD, Defendant.**

Civ. A. 12585.

United States District Court
W. D. Pennsylvania.

July 28, 1955.

Louis C. Glasso, Pittsburgh, Pa., for plaintiff.

Thomas W. Pomeroy, Jr., Pittsburgh, Pa., for defendant.

GOURLEY, Chief Judge.

This is a claim for damages resulting from a death action under the Federal

Employers' Liability Act, 45 U.S.C.A. § 51 et seq.

Upon jury trial, a verdict was returned in favor of plaintiff administratrix in the amount of Eighty Thousand Dollars ($80,000.00). The surviving wife and seven minor children suffered pecuniary loss as a result of the most unfortunate death.[1]

In answer to specific interrogatories, the jury found the total amount of damages to be $100,000.00 but attributed twenty per cent of the negligence which was the proximate cause of the accident to the decedent.[2]

The matters before the court are two-fold:

(1) Motion to set aside the verdict or for judgment notwithstanding the verdict.

(2) Motion for new trial.

### Motion to Set Aside The Verdict or For Judgment Notwithstanding The Verdict

The cause of action arose out of an unusual accident. Decedent, employed as a skip hoist operator, was found at the bottom of a pit under a steel bucket which constituted part of the skip hoist equipment, which mechanism was utilized in the servicing of defendant's locomotives. Sand is received from hopper cars and is conveyed from a pit beneath the hopper cars by the hoist bucket to the storage bin. From this bin it is dispensed to locomotives.

The duties of the hoist attendant are primarily to transfer sand from the hopper cars to the storage bin by the operation of the skip hoist which, fundamentally, is a bucket which ascends from the pit beneath the hopper car to the storage bin at the top of the structure and then descends again to the pit. The skip hoist apparatus which causes the bucket to function in this manner is electrically operated and controlled by means of electrical switches and buttons.

The bucket ascends and descends in a vertical line and is suspended from a cable. There are two sets of controls, one inside a shed and one outside on the wall of the shed adjacent to the pit. The bucket is designed to travel along an oblique path on rails to a point some fifteen feet under a set of railroad tracks where it trips a mechanism opening a hopper door and is filled with sand. The filling process takes about five seconds.

When filled, the bucket then comes out of the pit on a 127° slope and then vertically ascends some thirty to forty feet to the top of a concrete elevator where

---

1. Sustaining pecuniary loss were the widow, Pearl Elizabeth Thomas, age 37, and decedent's children: Rickey, age 2; David, age 6; Vera, age 8; Joyce, age 9; Mary Lou, age 12; Teddy, age 14 and Kenneth, age 16.

2. "Interrogatories

"Was the defendant, Conemaugh and Black Lick Railroad Company, a corporation, guilty of negligence which was a proximate cause or a substantial contributing cause of the accident in whole or in part?

"Answer: Yes Yes No——

"Should the answer to the above question be in the affirmative, state the extent or the amount of the negligence of the defendant, Connemaugh and Black Lick Railroad Company, a corporation, which was a proximate cause of the accident in whole or in part?

"Answer: 80%

"Was the decedent, Lewis Samuel Thomas guilty of negligence which was a contributing cause of the accident in whole or in part?

"Answer: Yes Yes No——

"Should the answer to the above question be in the affirmative, state the extent or the amount of the negligence of the decedent, Lewis Samuel Thomas, which was a contributing cause of the accident in whole or in part? (Express the extent of the negligence in percentage terms.)

"Answer: 20%

"What was the amount of damages suffered by the plaintiff administratrix, Pearl Thomas, which was the proximate result of the accident, without any consideration being given to the negligence of the defendant or contributory negligence on the part of the decedent employee?

"Answer: $100,000.00."

the sand is dumped. The bucket takes about five seconds to dump and then descends vertically downward back into the pit where the process of loading and unloading is repeated automatically. The time needed for the bucket to be filled in the bottom of the pit and to ascend to the top of the elevator is about fifteen seconds. The same amount of time is needed for its return trip. The whole cycle is completed in about 40 to 45 seconds.

This bucket can be operated automatically by pushing the "On" button and the "Hoist" button inside the shed. It can be stopped anywhere in its path by pushing another button called the "Safe" button. At such time as the machine is on automatic operation, it may be controlled by use of the outside switch to the following extent: Assuming the button on the outside switch remains in an out position, the machine continues to operate automatically until the current is completely shut off on the inside control or by depressing the button on the outside and turning it in a clockwise position. The bucket will continue to operate until it comes to rest in the bottom of the pit for reloading, and will stop and remain stopped until the button on the outside switch is released. In short, by depressing the outside button and locking it by turning it clockwise, the bucket will make one cycle and come to rest at the bottom of the pit and will remain stopped.

Decedent, in the performance of his duties, was required at infrequent intervals to descend into the pit to remove spilled sand from the floor of the pit and to grease guide rails which engage the wheels of the bucket and the gate or door beneath the hopper car which is opened and closed automatically by the bucket.

Plaintiff advanced three distinct theories from which anyone, or all, or a combination of more than one, the negligence of the defendant might be premised.

### Theory No. 1

That after decedent or another had depressed the outside push button and the hoist bucket was stopped, and decedent had descended into the hoist pit in the performance of his duties, vibration from surrounding blast furnaces, a cindering plant, and railroad movements caused the push button to spring out re-energizing the hoist machinery, causing the bucket to come down upon the decedent.

In support of this theory, plaintiff offered expert testimony of engineers to establish the defective condition of the outside switch. Their testimony developed the fact that the outside switch was composed of a button one inch in diameter and about 1½ inches in length and contained a slot about ¾ or one inch from the outside surface of the button. This slot when depressed and turned was supposed to come to rest on a metal lip in the frame of the switch, thereby guaranteeing to keep it locked in a depressed position. This switch in the skip hoist was defective in that the button was not designated to the particular switch, and if the button was so designed, then the cover upon which it was to lock itself was not the proper mate. The button was worn so that when depressed it was almost impossible to turn the button clockwise. Further, the button was worn to a degree that the notch in the button could not fit itself on the metal case. Friction, and friction alone, would hold the button in a depressed position. No safeguard or locking device was present that would insure the button remaining in a depressed position.

### Theory No. 2

Defendant failed to provide and maintain a reasonably safe place for decedent to work which was a proximate cause of his death.

Evidence was introduced to show that the decedent was required to enter a dark pit by means of a series of steel steps imbedded in concrete. Some of the rungs were missing and others were broken. A temporary makeshift was provided in place of repairing the broken rungs. This makeshift was a rope by which the employee could lower himself

into the pit. There was no light in the pit. There was no electric appliance or switch in the pit by which a workman in the pit could control the movement of the bucket in the event some intervening agency or person would start the movement of the bucket to the bottom of the pit. Furthermore, the dimensions of the pit were such that no clearance for the protection of a workman legally in the pit did exist at such time as the bucket descended into the pit. Because of the lack of clearance, lack of light and absence of a switch and the defective conditions of the rungs, the pit into which the decedent was required to go in order to remove the accumulation of debris rendered the pit an unsafe place in which to work. Thus, assuming that a workman in the pit was warned that the bucket was descending into the pit, the defective and missing rungs made it virtually impossible for him to escape from the pit and thereby escape certain death.

### Theory No. 3

That decedent's locale for the performance of his work was a restricted area, and that other employees, not specifically assigned to the hoist machine, had operated the machine on previous occasions and were familiar with its operation. That decedent descended into the pit in the course of his employment and that, thereafter, while the deceased was in the hoist pit, a third person energized the electrical controls and set the bucket in operation.

\*　\*　\*　\*　\*　\*

Defendant contends that there is no evidence in the record from which an inference of negligence on the part of the railroad can be drawn, or that if such negligence does exist, there is no basis to show that it was a proximate cause of the accident in whole or in part.

■■ A motion for a directed verdict or judgment notwithstanding the verdict under the Federal Rules raises a question of law only; that is whether there is any evidence which, if believed, would authorize a verdict against the defendant and the trial court in considering such motion does not exercise any discretion but makes only a ruling of law. Marsh v. Illinois Central R. Co., 5 Cir., 175 F.2d 498; Grayson v. Deal, D.C., 85 F.Supp. 431.

■ In passing upon a motion to set aside a verdict for plaintiff and to enter judgment for the defendant, evidence including all reasonable inferences to be drawn therefrom must be taken in the light most favorable to the plaintiff and all conflicts must be resolved in his favor. Waggaman v. General Finance Co. of Philadelphia, Pa., Inc., 3 Cir., 116 F.2d 254; Schad v. Twentieth Century-Fox Film Corp., 3 Cir., 136 F.2d 991; Lukon v. Pennsylvania R. Co., 3 Cir., 131 F.2d 327; Meyonberg v. Pennsylvania R. Co., 3 Cir., 165 F.2d 50; Kraus v. Reading Co., 3 Cir., 167 F.2d 313; O'Brien v. Public Service Taxi Co., 3 Cir., 178 F.2d 211.

■ The court is not free to re-weigh the evidence and set aside the jury's verdict merely because the jury could have drawn different inferences or conclusions, or because the court regards another result as more reasonable. Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520; Masterson v. Pennsylvania R. Co., 3 Cir., 182 F.2d 793.

■ Where uncertainty as to the existence of negligence arises from a conflict in the testimony, or because the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury. Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720.

■ The choice of conflicting versions of the way the accident happened, the decision as to which witness is telling the truth and the inferences to be drawn from the uncontroverted facts and the controverted facts are questions for the jury. If there is a reasonable basis in the record for concluding that it was negligence of the employer which caused the injury, it would be an invasion of the jury's function for the court to draw con-

trary inferences or to conclude that a different conclusion would be more reasonable. Ellis v. Union Pacific R. Co., 329 U.S. 649, 67 S.Ct. 598, 91 L.Ed. 572; Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916.

There was ample evidence to require submission to the jury the question of whether or not decedent met his death as a result of one, two, or the combination of all of the theories which plaintiff advanced.

The plaintiff produced evidence which supported her allegations of negligence and also showed by evidence which, if believed, together with the inferences which might reasonably be drawn therefrom, that the accident which occurred resulted from the negligence alleged. Nor is the plaintiff under a duty to exclude all causes except the one relied upon. In the instant case, based almost entirely upon circumstantial evidence, proof to a degree of absolute certainty is rarely attainable; it is sufficient if proof is such as to satisfy a reasonable mind; the law does not require the elimination of every possible cause of the accident other than that on which the plaintiff relies, but only such other causes, if any, as fairly arise from the evidence. The testimony need not exclude everything which the ingenuity of counsel may suggest as having possibly caused or contributed to the accident. Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 166 F.2d 908; Foley v. Pittsburgh-Des Moines Co., 363 Pa. 1, 68 A. 2d 517; Kotal v. Goldberg, 375 Pa. 397, 100 A.2d 630.

In circumstantial cases under the Federal Employers' Liability Act the domain of the jury may not be narrowly bounded and the settling of any question of negligence or proximate cause, where more than one rational possibility is invoked on the evidentiary facts is exclusively within the field and domain of the jury. Henwood v. Coburn, 8 Cir., 165 F.2d 418.

Defendant contends that decedent, in order that he meet his death as he did, must have acted negligently and himself contributed to the accident, and that the court was required to substitute its own judgment for that of the jury and find decedent guilty of contributory negligence as a matter of law, removing the case from jury consideration.

This court, in the trial of a death action involving the Federal Employers' Liability Act, must give cognizance to the legal presumption that decedent exercised due care for his own safety at the time the accident occurred and that he was actually engaged in the performance of his employment at the time of his death. Tennant v. Peoria & P. U. Ry. Co., supra.

It is only when plaintiff's act is the sole cause—when defendant's act is no part of the causation—that defendant is free from liability under the Act. Grand Trunk Western Ry. Co. v. Lindsay, 233 U.S. 42, 34 S.Ct. 581, 58 L.Ed. 838.

I am satisfied that the record evinces sufficient credible evidence to support the findings of the jury.

The motion for arrest of judgment or for judgment notwithstanding the verdict must be refused.

### Motion For New Trial

In addition to the general allegations that the verdict was against the evidence, the weight of the evidence and the law, it is contended:

(1) The court was in error in charging that the jury might apply the doctrine of res ipsa loquitur.

(2) The court committed error in failing to charge that if the decedent violated any of the safety rules of defendant, he was guilty of contributory negligence.

(3) The court committed error in refusing to charge the jury that if the deceased entered the pit without taking the required safety precautions, his negligence was the sole proximate cause of his death.

(4) The court committed error in refusing to charge that if after Lewis Thomas duly took all the required safety

precautions, a fellow employee removed the precautions and energized the hoist mechanism, the defendant railroad would not be liable for the death of Lewis Thomas unless the company knew an employee would disregard the precautions.

(5) The court committed prejudicial error in admitting into evidence, the Coroner's Return of View and the Death Certificate.

(6) The court committed prejudicial error in admitting into evidence the demonstration model ladder and lucite switches.

(7) The court committed prejudicial error in permitting plaintiff's counsel to ask hypothetical questions in the form offered to the witnesses, Bates and Bowling.

(8) The court committed prejudicial error in permitting plaintiff's counsel to cross-examine the witnesses, Holtzman, Heinlein and Meyer, called by plaintiff as hostile witnesses.

(9) The court committed prejudicial error in admitting into evidence a photograph of the outside push button, with cover removed.

(10) The verdict is excessive.

1. In connection with the court's instructions on the rule of res ipsa loquitur, defendant does not contend that the court did not state the rule correctly, but argues that the court erred in including the instruction in its charge.

In its charge, the court did not invoke the doctrine of res ipsa loquitur, but merely instructed upon circumstances under which the rule would become applicable.

The court charged that the rule could be applied only in the event that the decedent was not negligent in the performance of his duties. The court charged that the following conditions must exist before the rule could be considered:

(1) An accident must be of a kind which ordinarily does not occur in the absence of someone's negligence,

(2) It must be caused by an agency or instrumentality within the exclusive and sole control of the defendant.

(3) It must not have been due to any voluntary action or contribution on the part of the person injured by doing or failing to do what should have been done by a reasonable, careful, prudent person to look after his own welfare and safety. Sweeting v. Pennsylvania R. Co., 3 Cir., 142 F.2d 611; Jesionowski v. Boston & Maine R. Co., 329 U.S. 452, 67 S.Ct. 401, 91 L.Ed. 416.

Evaluating the evidence adduced during the course of trial, and considering the extraordinary circumstances under which decedent's death occurred, it is my judgment that it was incumbent upon the court to charge upon the subject of res ipsa loquitur.

But even assuming that the court erred in so charging, no prejudice could have been inflicted upon the defendant since the jury cast aside and gave no effect to the rule in finding decedent twenty per cent contributorily negligent, and necessarily premised its findings of negligence upon an unsafe place in which to work and/or equipment with which to work.

2. With reference to violation of company rules, the court charged that if such violation did exist, it became a question for the jury to determine whether or not such violation constituted negligence or contributory negligence on the part of either the plaintiff or any of the employees of the defendant.

On the same line of thought, the court further charged that the obeying of a company rule as a matter of law does not necessarily constitute due care and caution on the part of the employee who obeys the rule. Even if the rule is obeyed, it becomes a question of fact for the jury whether or not the observance of it or the obeying of the rule constituted or amounted to due care and caution on the part of the employee or employees who obeyed the rule.

The law is well established that the violation of a company rule does not constitute negligence or contributory negligence as a matter of law. It is for the jury to determine whether violation of such rule or rules is a proximate cause

which contributed in part or whole to the accident. Frabutt v. New York Central & St. Louis R. Co., D.C., 88 F.Supp. 821; Atchison, T. & S. F. Ry. Co. v. Ballard, 5 Cir., 108 F.2d 769, certiorari denied 310 U.S. 646, 60 S.Ct. 1096, 84 L.Ed. 1413; Healy v. Pennsylvania R. Co., 3 Cir., 184 F.2d 209.

3. I cannot accept defendant's thesis that the court should have charged that if decedent violated safety precautions in entering the pit, his negligence was the sole proximate cause of his death. The charge as it related to violation of Company Safety Rules and the doctrine of comparative negligence, as well as the instructions on preponderance of the evidence and contributory negligence, left such determination with the jury. To charge as defendant requested would require the court to usurp the prerogatives of the jury and would prove inconsistent with the law as applied under the Federal Employers' Liability Act.

■ 4. The Federal Employers' Liability Act imposes liability upon a defendant for an injury resulting from the negligence of a fellow servant. I have never come upon the novel requirement in law, as defendant propounds, that a defendant railroad is required to know that an employee would disregard safety precautions before said railroad would be liable for the negligent act of omission or commission of its employee or employees.

5. In admitting into evidence a Death Certificate and Coroner's Return of View, the court charged as follows:

"There is a provision of law that where a certificate of death or a coroner's certificate is offered in evidence, such certificate shall constitute prima facie evidence of its contents, but such certificate is always open to contradiction or explanation by either plaintiff or defendant, regardless of who offered it.

"The statements, therefore, which appear in the coroner's or death certificate are not conclusive and binding on either party to this proceeding, but are open to explanation, contradiction or modification, and are only prima facie evidence of the statements contained thereon."

■ Death certificates are admissible under Federal and Pennsylvania Statute. 28 U.S.C.A. § 1732; 35 Pa.P.S. §§ 450.101–450.1003.

■ The law is firm to the effect that a death certificate is prima facie evidence of the facts stated therein, but is always open to contradiction by any of the parties regardless who offered it. Norwood v. Great American Indemnity Co., 3 Cir., 146 F.2d 797; Meth v. United Benefit Life Ins. Co., 3 Cir., 198 F.2d 446; Moran v. Pittsburgh-Des Moines, 3 Cir., 183 F.2d 467; McKee v. Jamestown Baking Co., 3 Cir., 198 F.2d 551; Hunter v. Derby Foods, Inc., 2 Cir., 110 F.2d 970, 133 A.L.R. 255 (involving a coroner's certificate); Evans v. Penn Mutual Life Ins. Co., 322 Pa. 547, 556, 186 A. 133; Cockcroft v. Metropolitan Life Ins. Co., 125 Pa.Super. 293, 189 A. 687; Castor v. Ruffing, 178 Pa.Super. 124, 112 A.2d 412.

I am satisfied that the law as enunciated in the court's charge is proper.

■ 6. It is elemental that the use of maps, models and diagrams are permissible as modes of conveying a witness's knowledge. Wigmore on Evidence, 3rd Ed., Vol. III, Section 791, page 176.

The demonstration model of the ladder was examined by defendant's expert, and was made to conform to the exact measurements and slope of the steel rungs located in the pit.

The lucite model of the push button switch was not permitted to be taken out by the jury during the course of their deliberations, and was limited for use by an expert witness to demonstrate the manner in which a push button switch operates.

The court exerted meticulous care in charging the jury as to the purpose of the models.[3]

██ I am convinced that the models as employed during the course of trial proved invaluable in assisting the jurors to grasp and comprehend the explanations of expert witnesses, and further permitted jurors to visualize in concrete form the numerous dimensions pertaining to the metal rungs which was crucial to a proper evaluation of the evidence.

██ 7. I can find no error in permitting plaintiff's counsel to pose hypothetical questions of the nature presented during trial to his expert witnesses. The questions now disputed, most lengthy in character, were reviewed by defense counsel in great detail prior to their being asked in order to restrict said questions to facts already in evidence, and the court and all counsel labored with most thoroughness to confine the questions to such evidence. Where proof is necessarily confined to matters beyond the knowledge of laymen, and expert knowledge is imperative in order to properly evaluate the significance of certain facts, the hypothetical form of question becomes a vital factor in giving clarity and meaning to such facts. Questions of this nature have been long recognized as proper method to assist in presentation of a case. Moran v. Pittsburgh-Des Moines, 3 Cir., 183 F. 2d 467, supra; Saunders v. Glenshaw Glass Co., 3 Cir., 204 F.2d 436; Foley v. Pittsburgh-Des Moines, 363 Pa. 1, 68 A.2d 517; Strobel v. Park, 292 Pa. 200, 140 A. 877, 57 A.L.R. 253.

8. In the course of trial, this court permitted plaintiff's counsel to cross-examine witnesses Haltzman, Heinlein and Mayer, supervisory employees of defendant railroad called by plaintiff.

██ It is noteworthy that this court initially refused plaintiff's request to question the witnesses as of cross-examination. But upon further observation, it became apparent that the witnesses were hedging, had indicated an intention to evade questions—demonstrating a demeanor of hostility. In a death case of this nature, where the facts must be ferreted out in order to effectuate the administration of justice, I felt it my duty to exercise my discretion in permitting plaintiff to resort to examination on the basis of hostile witnesses. Johnson v. Baltimore & O. R. Co., 3 Cir., 208 F.2d 633; Eckenrode v. Pennsylvania R. Co., 3 Cir., 164 F.2d 996.

██ 9. In view of one of plaintiff's contentions that vibration caused the push button to spring out as a result of the defective condition of the switch, the condition of the outside switch became an issue of extreme importance. Plaintiff introduced in evidence a photograph of the outside push button switch with cover removed.

The accuracy or truthfulness of the photograph was not in dispute. I am unable to accept defendant's thesis that a photograph of this nature is prejudicial error.

10. At first impression an award in a death case in the amount of $100,000 appears to be of great magnitude and subject to severe scrutiny.

3. The court charged as follows:

"As stated to you earlier, I charge you, as a matter of law, that the demonstration model of the ladder which has been introduced by the plaintiff is to be considered by you to show only three things: (1) The slope of the concrete slab in the coal hoist pit; (2) the number of steel rungs originally imbedded in that slope; and (3) the space between such steel rungs. I charge you that there is in fact no ladder in the pit and that you are not to consider the ladder put in evidence by the plaintiff as representing the true condition of the pit except as to the three matters above.

"I likewise charge you that the lucite model of a push button switch introduced by plaintiff does not represent the push button switch located on the outside of the hoist house at the Service Station but is introduced solely to illustrate two points: (1) A push button switch which is spring operated; and (2) how such a button, but not the push button here involved, might be held in place by friction. I charge you again that this model does not represent the button involved in this case nor does it show the manner in which the push button switch in this case was held in place."

The jury by its verdict found that the pecuniary loss which the plaintiff would suffer as a result of the death of her husband, Lewis Thomas, reduced to its present worth was $100,000. The jury then reduced this amount by 20% because it found decedent's contributory negligence to have been 20% of the cause of his own death. The jury's final award to plaintiff was therefore $80,000.

At the time of his death decedent had a life expectancy, according to the United States Mortality Tables, of 25.22 years. In the year prior to his death he earned $4,400 as an employee of defendant railroad.

Decedent was a man of frugal habits, limiting his yearly expenditures for his own use to a bare minimum of $400.

Decedent was healthy and industrious devoting considerable of his time to teaching Sunday School classes and other religious work.

The jury had a right to infer, and, no doubt, did take into consideration, that with the prevailing yearly increases in wages, and the possibility of full time employment the decedent could have earned more than $4,400 a year had he lived. Thus, it is not unreasonable to infer that the jury could well have found that the decedent may have earned any sum between $4,400 to $6,000 a year, which latter figure is not uncommon for a railroad worker. Hence, the gross earnings as determined by the jury could have ranged anywhere from the sum of $111,000 to $150,000 for decedent's life expectancy of twenty-five and .22 years as projected by the United States Mortality Tables.

The jury observed decedent's photograph and heard testimony as to his manner of living. They had a right to conclude that the decedent could have lived considerably beyond the number of years accorded to him under the expectancy tables. Thus, the jury could have concluded that had he lived five, or even ten years longer, even at a diminished earning capacity, he could have well earned anywhere from $20,000.00 to $30,000.00 more than the gross earnings computed under a life expectancy of 25.22 years.

Be that as it may, a most significant and enigmatic element of damages arose in the jury's award for loss of nurture suffered by his seven minor children. That this is an element of damage admits of no doubt. Michigan Central R. Co. v. Vreeland, 227 U.S. 59, 33 S.Ct. 192, 57 L.Ed. 417; Gaydos v. Domabyl, 301 Pa. 523, 152 A. 549.

Such loss must include compensation for the care, training, advice, guidance, education which have been lost and which are susceptible of money valuation. Michigan Central R. Co. v. Vreeland, supra.

The ages of the children at time of decedent's death were 2 years, 6 years, 8 years, 9 years, 12 years, 14 years and 16 years.

The jury heard testimony that the children received unusual religious, moral and intellectual training, as well as physical training, from their father. The rearing of a child entails far more than merely supplying the necessary food, clothing and shelter. Its mental, moral and physical training are the keystone to the arch of future living and good citizenship.

What would it cost to hire instructors or teachers to impart such training? In considering the ages of the seven minor children, there was a total loss of eighty years of nurture; or in other words, a sum total of eighty years was required for the seven children to attain their majority, at which time the father's nurture would be presumed to cease.

Surely the sum of $400 per year cannot be considered excessive to pay for moral, intellectual and physical training of a child. Tuition alone, in schools that provide this type of training, averages between $300 and $400 a year. Sums ranging up to $5,000 for each child for loss of nurture have been held not excessive. Lancaster & Wight v. Allen, Tex. Civ.App., 207 S.W. 984; St. Louis Southwestern R. Co. of Texas v. Anderson, Tex.Civ.App., 206 S.W. 696; Miller v. Southern Pacific Co., 117 Cal.App.2d 492, 256 P.2d 603; Texas & Pacific R. Co.

v. Riley, Tex.Civ.App., 183 S.W.2d 991; Clark v. Prime, 12 A.2d 635, 18 N.J.Misc. 226.

Different formulae have been applied by the courts in arriving at the present value of future earnings. The most prevalent in computing the present value of future earnings and benefits is a rate based on percentage of interest available in safe investments. As a rule, the best and safest investments, and those that require the least amount of care and skill yield only a moderate rate of interest. Chesapeake & Ohio Ry. Co. v. Kelly, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117. This is justly so because the average layman does not possess the skill of an investor, nor does the law require the plaintiff to jeopardize an award by speculative investment.

It is the court's observation that safe investments range from two and one-half to three percent, the latter generally representing investment in United States Savings Bonds which render use of principal as required in the instant circumstance, unprofitable until maturity.

In evaluating the award arithmetically, the law recognizes that the sum discounted on the basis of reasonable interest must be such that both principal and interest would be completely dissipated within the decedent's life expectancy.

On the basis of a life expectancy of $25\frac{1}{4}$ years, and the payment of $400 per year of each year of nurture to each child until it attains its majority, discounted on the basis of $2\frac{1}{2}\%$, an award of $100,000 is consistent and reasonable.[4]

4. At time of decedent's death, the children were aged as follows:

| Ricky | 2 years; | hence 19 years of nurture; |
| David | 6 years; | hence 15 years of nurture; |
| Vera | 8 years; | hence 13 years of nurture; |
| Joyce | 9 years; | hence 12 years of nurture; |
| Marylou | 12 years; | hence 9 years of nurture; |
| Ted | 14 years; | hence 7 years of nurture; |
| Ken | 16 years; | hence 5 years of nurture; |

OR A TOTAL OF 80 years of nurture.

At $400.00 per year for each year of nurture added to $4000.00 per year (being the amount earned of $4400.00 less $400.00 for decedent's keep) the principal should be reduced for the first nineteen years at the following rates:

| 1st yr. | $4000.00 plus 7 years of nurture or $2800.00 totaling $6800.00 |
| 2nd yr. | $4000.00 plus 7 years of nurture or $2800.00 totaling $6800.00 |
| 3rd yr. | $4000.00 plus 7 years of nurture or $2800.00 totaling $6800.00 |
| 4th yr. | $4000.00 plus 7 years of nurture or $2800.00 totaling $6800.00 |
| 5th yr. | $4000.00 plus 7 years of nurture or $2800.00 totaling $6800.00 |
| 6th yr. | $4000.00 plus 6 years of nurture or $2400.00 totaling $6400.00 |
| 7th yr. | $4000.00 plus 6 years of nurture or $2400.00 totaling $6400.00 |
| 8th yr. | $4000.00 plus 5 years of nurture or $2000.00 totaling $6000.00 |
| 9th yr. | $4000.00 plus 5 years of nurture or $2000.00 totaling $6000.00 |
| 10th yr. | $4000.00 plus 4 years of nurture or $1600.00 totaling $5600.00 |
| 11th yr. | $4000.00 plus 4 years of nurture or $1600.00 totaling $5600.00 |
| 12th yr. | $4000.00 plus 4 years of nurture or $1600.00 totaling $5600.00 |
| 13th yr. | $4000.00 plus 3 years of nurture or $1200.00 totaling $5200.00 |
| 14th yr. | $4000.00 plus 2 years of nurture or $800.00 totaling $4800.00 |
| 15th yr. | $4000.00 plus 2 years of nurture or $800.00 totaling $4800.00 |
| 16th yr. | $4000.00 plus 1 year of nurture or $400.00 totaling $4400.00 |
| 17th yr. | $4000.00 plus 1 year of nurture or $400.00 totaling $4400.00 |
| 18th yr. | $4000.00 plus 1 year of nurture or $400.00 totaling $4400.00 |
| 19th yr. | $4000.00 plus 1 year of nurture or $400.00 totaling $4400.00 |

and for the next 6 and $\frac{1}{4}$ years the principal will be reduced as follows:

| 20th yr. | $4000.00 | $4000.00 |
| 21st yr. | $4000.00 | $4000.00 |
| 22nd yr. | $4000.00 | $4000.00 |
| 23rd yr. | $4000.00 | $4000.00 |
| 24th yr. | $4000.00 | $4000.00 |
| 25th yr. | $4000.00 | $4000.00 |
| $25\frac{1}{4}$th yr. | $1000.00 | $1000.00 |

Table reducing principal of $100,000.00 at the above rates computed at 2½% interest over 25¼ years:

| At end of | Amount allocated less interest | Remaining Principal |
|---|---|---|
| | 6800.00 | 100,000.00 |
| | 2500.00 | 4,300.00 |
| 1st year | | 95,700.00 |
| | 6800.00 | |
| | 2392.50 | 4,407.50 |
| 2nd year | | 91,292.50 |
| | 6800.00 | |
| | 2282.31 | 4,517.69 |
| 3rd year | | 86,774.81 |
| | 6800.00 | |
| | 2169.37 | 4,630.63 |
| 4th year | | 82,144.18 |
| | 6800.00 | |
| | 2053.60 | 4,746.40 |
| 5th year | | 77,397.78 |
| | 6400.00 | |
| | 1934.94 | 4,465.06 |
| 6th year | | 72,932.72 |
| | 6400.00 | |
| | 1823.31 | 4,576.69 |
| 7th year | | 68,356.03 |
| | 6000.00 | |
| | 1708.90 | 4,291.10 |
| 8th year | | 64,064.93 |
| | 6000.00 | |
| | 1601.62 | 4,398.38 |
| 9th year | | 59,666.55 |
| | 5600.00 | |
| | 1491.66 | 4,108.34 |
| 10th year | | 55,558.21 |
| | 5600.00 | |
| | 1388.95 | 4,211.05 |
| 11th year | | 51,347.16 |
| | 5600.00 | |
| | 1283.67 | 4,316.33 |
| 12th year | | 47,030.83 |
| | 5200.00 | |
| | 1175.77 | 4,024.23 |
| 13th year | | 43,006.60 |

| At end of | Amount allocated less interest | Remaining Principal |
|---|---|---|
| | (Principal balance brought forward) | 43,006.60 |
| | 4800.00 | |
| | 1075.16 | 3,724.84 |
| 14th year | | 39,281.76 |
| | 4800.00 | |
| | 982.04 | 3,817.96 |
| 15th year | | 35,463.80 |
| | 4400.00 | |
| | 886.59 | 3,513.41 |
| 16th year | | 31,950.39 |
| | 4400.00 | |
| | 798.75 | 3,601.25 |
| 17th year | | 28,349.14 |
| | 4400.00 | |
| | 708.72 | 3,691.28 |
| 18th year | | 24,657.86 |
| | 4400.00 | |
| | 616.44 | 3,783.56 |
| 19th year | | 20,874.30 |
| | 4000.00 | |
| | 521.85 | 3,478.15 |
| 20th year | | 17,396.15 |
| | 4000.00 | |
| | 434.90 | 3,565.10 |
| 21st year | | 13,831.05 |
| | 4000.00 | |
| | 345.77 | 3,654.23 |
| 22nd year | | 10,176.82 |
| | 4000.00 | |
| | 254.42 | 3,745.58 |
| 23rd year | | 6,431.24 |
| | 4000.00 | |
| | 160.78 | 3,839.22 |
| 24th year | | 2,592.02 |
| | 4000.00 | |
| | 64.80 | 3,935.20 |
| 25th year | (deficiency) | 1,343.18 |
| | 1000.00 | |
| | (no interest, fund exhausted) | 1000.00 |
| 25th and ¼th year | (deficiency) | 2,343.18 |

At end of period fund deficient by total of $2,343.18

The jury further could well have found from the testimony that the decedent performed other compensatory services in and about the home, such as painting and repairing the premises, plumbing, gardening, and many other types of services, which represented over the potential life span of decedent a substantial pecuniary loss.

This Circuit has sustained a verdict of $70,000.00 to a wife and one child for the death of a steel worker, 32 years of age, whose earnings averaged $3,200 per year. McKee v. Jamestown Baking Co., supra. In Van House v. Acorn Steel Co., 3 Cir., 144 F.2d 204, a verdict of $16,000.00 for a widow of a farmer, 22 years of age, who averaged $700.00 per year, was affirmed. The Seventh Circuit sustained a verdict of $70,000 for a widow and two children of a yard conductor killed at the age of 32. Fritz v. Pennsylvania R. Co., 7 Cir., 185 F.2d 31. $116,500 was sustained for death of a thirty-nine year old decedent earning $5,400.00 and survived by a wife and five children, New York, N. H. & H. R. Co. v. Zermani, 1 Cir., 200 F.2d 240.

 The court should not set aside a verdict on the ground that it is excessive unless it is so high as to shock the conscience. In the absence of any showing that the jury was biased or acted capriciously or unreasonably, the court will not interfere with the verdict. Foresman v. Pepin, D.C., 71 F.Supp. 772, affirmed 3 Cir., 161 F.2d 872.

 I am satisfied that the award was commensurate with the amount of damages evinced in the record.

\* \* \* \* \* \*

In considering the instant motion for new trial, I have evaluated the complete record and exhibits with meticulous care, cognizant as I must be of the great degree of circumstantial proof upon which plaintiff was required to rely.

The record evinces a clash between expert witnesses, each espousing his own theory as to the cause of the accident. Defendant advances the proposition that plaintiff's experts' testimony was not credible. I have carefully scrutinized this testimony, and I am satisfied that it is consistent, coherent and logically sound, and indeed, creates such inferences from which the jury could have reasonably concluded the negligent conduct of defendant.

To summarily expunge this testimony, and substitute the personal opinion of the court or defendant's experts, would do violence to the processes and purport of the jury trial. The instant jury appears to have given most studied consideration to the evidence.[5]

Upon recapitulation of all the credible evidence, I am convinced that the quantum of proof is such that a jury could reasonably conclude that failure of defendant railroad to provide decedent with a safe place to work and/or safe equipment with which to work was the proximate cause of his death.

It is my considered judgment that the verdict rendered was not against the evidence, weight of the evidence, or the law.

After again applying most reflected judgment to the record, I believe that under all the credible evidence justice sustains plaintiff's right to recover in the amount of $80,000.

An appropriate Order is entered.

---

5. The jury commenced its deliberations at 3:30 P.M. and did not return its verdict until 12:40 A.M. the following day.